# Illinois Official Reports

## Supreme Court

---

### *People v. Chairez*, 2018 IL 121417

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JULIO CHAIREZ, Appellee. |
| Docket No. | 121417 |
| Filed | February 1, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, the Hon. John A. Barsanti, Judge, presiding. |
| Judgment | Circuit court judgment affirmed in part and vacated in part. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Garson S. Fischer, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| | Michael J. Pelletier, State Appellate Defender, Thomas A. Lilien, Deputy Defender, and Erin S. Johnson, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Elgin, for appellee. |
| Justices | CHIEF JUSTICE KARMEIER delivered the judgment of the court, with opinion. |
| | Justices Freeman, Thomas, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion. |

## OPINION

¶ 1      At issue in this appeal is the constitutionality of section 24-1(a)(4), (c)(1.5) of the unlawful use of a weapon (UUW) statute (720 ILCS 5/24-1(a)(4), (c)(1.5) (West 2012)), which, in pertinent part, prohibits an individual from carrying or possessing a firearm within 1000 feet of a public park.

¶ 2                      PRINCIPAL STATUTE INVOLVED

¶ 3      At the time of the proceedings herein, the UUW statute provided:

> "§ 24-1. Unlawful Use of Weapons.
>
> (a) A person commits the offense of unlawful use of weapons when he knowingly:
>
> * * *
>
> (4) Carries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm, except that this subsection (a)(4) does not apply to or affect transportation of weapons that meet one of the following conditions:
>
> > (i) are broken down in a non-functioning state; or
> >
> > (ii) are not immediately accessible; or
> >
> > (iii) are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card[.] ***
>
> * * *
>
> (c) Violations in specific places.
>
>      ***
>
> (1.5) A person who violates subsection 24-1(a)(4) *** on any public way within 1,000 feet of the real property comprising any school, public park, courthouse, public transportation facility, or residential property owned, operated, or managed by a public housing agency or leased by a public housing agency as part of a scattered site or mixed-income development commits a Class 3 felony." 720 ILCS 5/24-1(a)(4), (c)(1.5) (West 2012).

¶ 4                               BACKGROUND

¶ 5      On April 24, 2013, pursuant to a negotiated plea agreement, defendant Julio Chairez pled guilty in the circuit court of Kane County to possessing a firearm within 1000 feet of Virgil Gilman Trail, a park in Aurora, Illinois, in exchange for the State's agreement to file a *nolle prosequi* for several other charges and the recommendation that defendant receive a sentence of two years' probation.

¶ 6      On November 5, 2015, defendant filed a postconviction petition, seeking to vacate the conviction on the basis that the statute was unconstitutional under the second amendment to the United States Constitution. U.S. Const., amend. II. The circuit court heard arguments by counsel for defendant and the State regarding defendant's petition for relief. At the hearing,

defendant argued that an individual who is barred from carrying a firearm within 1000 feet of the many locations listed in section 24-1(c)(1.5) of the UUW statute is essentially barred from carrying a firearm in public. Therefore, counsel reasoned, section 24-1(c)(1.5) was more closely akin to a blanket prohibition than a restriction on carrying a gun in certain sensitive places. In response, the State argued that the firearm restriction is not a blanket prohibition because it prevents people from carrying firearms only in certain proscribed areas.

¶ 7    In its oral ruling given on July 29, 2016, the circuit court declared section 24-1(a)(4), (c)(1.5) of the UUW statute unconstitutional. In so ruling, the court found that the 1000-foot firearm restriction was not a reasonable regulation on the second amendment. On this point, the court stated:

> "The effect of the thousand foot language on gun rights is a near comprehensive ban. The practical effect is that a person cannot leave his house with his licensed firearm because he would constantly be in jeopardy of accidentally and unknowingly entering within a thousand feet of a school, public park, public transportation facility, or residential property owned, operated or managed by [a] public housing agency[ ]."

¶ 8    Comparing the language of section 24-1(a)(4) to that of the offenses declared facially unconstitutional in *People v. Aguilar*, 2013 IL 112116, and *People v. Mosley*, 2015 IL 115872, the circuit court found the offense established by section 24-1(a)(4), (c)(1.5) unconstitutional. The court went on to further note that the language concerning defendant's charge of possessing a firearm within 1000 feet of a public park, albeit different from the facially unconstitutional statutes in *Aguilar* and *Mosley*, "does not rescue the Statute." Accordingly, the court ruled defendant's conviction void, granted his motion, and vacated his UUW conviction.

¶ 9    On September 7, 2016, the circuit court entered its written order, as required by Illinois Supreme Court Rule 18 (eff. Sept. 1, 2006). Pursuant to Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013), the State's appeal from the circuit court's finding of statutory unconstitutionality comes directly to this court.

¶ 10                                    ANALYSIS

¶ 11    As an initial matter, we must address some discrepancies and incomplete portions of the circuit court's Rule 18 order finding section 24-1(a)(4), (c)(1.5) unconstitutional. The court's order is the latest of recent direct appeals in which we have been required to discern the scope of the written order declaring a statute to be unconstitutional. See *People v. Rizzo*, 2016 IL 118599, ¶ 25 (Rule 18 order lacked a sufficient discussion or analysis); *People v. Schweihs*, 2015 IL 117789, ¶ 17 (same); *Mosley*, 2015 IL 115872, ¶ 11 (discrepancy as to which section of the aggravated UUW (AUUW) statute the circuit court actually found unconstitutional). Here, we are again faced with a ruling that is conclusory and unsupported by a clear legal analysis or explanation despite Rule 18's requirement that the circuit court "clearly identif[y]" in a written or transcribed oral order what portions of the statute are being held unconstitutional and on what specific grounds. Rather, the court's single-page order simply restated the requirements set forth in the rule and concluded that section 24-1(a)(4), (c)(1.5) was

unconstitutional "for reasons previously stated of record."[1] Without a clear explanation for its ruling, this court is left with the difficult task of determining the basis of the circuit court's ruling. We reiterate, again, " '[w]hen a circuit court does something as serious as holding that a statute violates the constitution, then the circuit court must also be mindful to clearly state *** the legal basis for that ruling.' " *Schweihs*, 2015 IL 117789, ¶ 17 (quoting *People v. Cornelius*, 213 Ill. 2d 178, 189 (2004)).

¶ 12    Not readily apparent from the written order or the court's oral pronouncement is a clear answer to the important question of whether the statute was unconstitutional facially or as applied. From what we can construe from the record, the circuit court held that the restricted conduct under section 24-1(a)(4) within 1000 feet of schools, public parks, courthouses, public housing, and public transportation facilities was facially unconstitutional. We arrive at this conclusion based on the court's continuous reference and application of the holdings in *Aguilar* and *Mosley*. The circuit court found that the language of section 24-1(a)(4) of the UUW statute was "almost identical" to the comprehensive firearm ban on the possession of a firearm for self-defense purposes declared unconstitutional in *Aguilar* and *Mosley*. The court determined further that the 1000-foot language in section 24-1(c)(1.5) does not save the statute because the additional restriction is a "near comprehensive ban on the [d]efendant's [s]econd [a]mendment rights," by prohibiting carriage in areas where *Aguilar* and *Mosley* allow an individual to carry. Central to the court's concern was the practical inability of any individual to bypass the various areas protected under section 24-1(c)(1.5) and the lack of an exception for carrying or possessing a firearm in self-defense. The court's reasoning makes it clear the court held section 24-1(a)(4), (c)(1) unconstitutional on its face as violative of the second amendment because it viewed the regulation as a comprehensive firearm restriction on all individuals. Moreover, our finding is supported by the fact that the parties have confined their contentions before this court on the basis that the circuit court made a facial unconstitutionality declaration.

¶ 13    Next, we must determine whether the circuit court touched upon legal questions not before it. Addressing this same concern, this court in *Mosley* reaffirmed the general rule that "courts do not rule on the constitutionality of a statute where its provisions do not affect the parties [citation], and decide constitutional questions only to the extent required by the issues in the case." *Mosley*, 2015 IL 115872, ¶ 11. The circuit court's order conflicts with this rule by finding unconstitutional the entirety of section 24-1(a)(4), (c)(1.5), without limitation to the single offense of which defendant was convicted under the statute. Because defendant was convicted of violating section 24-1(a)(4), (c)(1.5) by being within 1000 feet of a public park, the various other "specific places" offenses set forth in section 24-1(c)(1.5) were not before the circuit court, and therefore defendant lacked standing to challenge the constitutionality of the offenses of which he was not charged. See *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d

---

[1]Rule 18 requires that a court "shall not" find a statute unconstitutional unless the court makes a finding in a written or transcribed oral order; the order clearly identifies which portion of the statute is unconstitutional; and the order states the specific grounds of unconstitutionality, including the constitutional provision upon which the finding is based, whether the statute is invalid on its face or as applied, whether the statute can be construed in a manner that could preserve its constitutionality, that the finding cannot rest on an alternate ground, and that proper notice has been served on the State. Ill. S. Ct. R. 18 (eff. Sept. 1, 2006).

- 4 -

266, 296 (2009) (Thomas, J., specially concurring) ("A court cannot rule on the constitutionality of a statute that is not before it, nor can the court rule on the merits of a case over which it lacks jurisdiction."). Therefore, the circuit court's finding as to the constitutionality of the other offenses included under section 24-1(c)(1.5) constituted an advisory opinion, which Illinois courts are not permitted to render. *Mosley,* 2015 IL 115872, ¶ 11. Accordingly, we limit our discussion to the firearm restriction under section 24-1(a)(4), (c)(1.5) to which defendant pled guilty—possession of a firearm within 1000 feet of a public park. To the extent that the circuit court's order or statements could be interpreted as finding any other portion of section 24-1(a)(4), (c)(1.5), which is not at issue, as being unconstitutional, such finding is vacated. *Id.* ¶ 12. We make no finding, express or implied, with respect to the constitutionality or unconstitutionality of any offense within the UUW statute other than what is properly before this court. *Id.*

¶ 14                                               Merits

¶ 15      Turning to the merits of this case, all statutes are presumed constitutional, and courts have a duty to construe legislative enactments so as to uphold their validity if reasonably possible. *Aguilar*, 2013 IL 112116, ¶ 15. To overcome this presumption, the party challenging the constitutionality of a statute has the burden of clearly establishing that it violates the constitution. *Mosley*, 2015 IL 115872, ¶ 22. The question of whether a statute is unconstitutional is a question of law, which this court reviews *de novo*. *Id.*

¶ 16      Defendant first argues that this court need not engage in any constitutional analysis because the case is controlled by our recent decision in *People v. Burns*, 2015 IL 117387. In *Burns*, the defendant was convicted of violating section 24-1.6(a)(1), (a)(3)(A) of the AUUW statute (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2008)). *Burns*, 2015 IL 117387, ¶ 1. At sentencing, pursuant to the sentencing provision of the AUUW statute, section 24-1.6(d), the State presented, for the first time, proof of defendant's prior felony conviction to enhance the classification of the offense from a Class 4 felony to a Class 2 felony. *Id.* ¶ 13. Before this court, defendant Burns argued that his conviction of the Class 2 form of the offense must be reversed in light of *Aguilar*, which found the Class 4 form of the same AUUW offense to be unconstitutional. *Id.* ¶ 20. This court agreed with defendant's contention and reversed his conviction and sentence. *Id.* ¶ 32. In doing so, we found that section 24-1.6(a)(1), (a)(3)(A) of the AUUW statute is facially unconstitutional "without limitation" (*id.* ¶ 29) because "[t]he offense, as enacted by the legislature, does not include as an element of the offense the fact that the offender has a prior felony conviction" (*id.* ¶ 25). As such, we held there is only one offense of AUUW based on section 24-1.6(a)(1), (a)(3)(A), and a prior felony conviction that enhances the felony classification at sentencing is not an element of that offense but, rather, a sentencing factor which enhances the penalty from a Class 4 felony to a Class 2 felony. *Id.* ¶ 24.

¶ 17      Here defendant argues that the penalty enhancement found under section 24-1(c)(1.5) of the UUW statute acts similarly to the sentencing enhancement of section 24-1.6(d) of the AUUW statute. Defendant, however, is mistaken on a fundamental point. Unlike in *Burns* where the felony enhancement came *after* the defendant was found guilty of the charged offense, the felony enhancement under section 24-1(c)(1.5) is a specific fact that must be proved to the trier of fact *prior* to a guilty finding. This difference is significant to our finding

because any fact, other than a prior conviction, which, by law, increases the penalty for a crime, is an element of a distinct and aggravated crime that must be submitted to the jury. See *Alleyne v. United States*, 570 U.S. 99, ___, ___, 133 S. Ct. 2151, 2155, 2163 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). That is the precise situation here where, in order to enhance the offense from a Class 4 felony to a Class 3 form of UUW, the State must prove the aggravating fact that defendant was within 1000 feet of a public park. 720 ILCS 5/24-1(a)(4), (c)(1.5) (West 2012).

¶ 18    This conclusion is supported by the plain language of the UUW statute. Unlike in *Burns* where the enhancement issue came from the specific sentencing provision of the AUUW statute, section 24-1(c)(1.5) is separate and apart from the sentencing provision of the UUW statute, section 24-1(b). Thus, we presume that the General Assembly intended that, if proven at trial, the specific locations enumerated in section 24-1(c)(1.5) are to be separate offenses that carry their own enhanced sentences different from the prescribed sentences in section 24-1(b). See *People v. Goossens*, 2015 IL 118347, ¶ 12 ("It is well settled that when the legislature uses certain language in one instance of a statute and different language in another part, we assume different meanings were intended."). Accordingly, we find the sentencing enhancement in *Burns* distinguishable from the provision at issue in this case because it adds an extra element to the Class 4 felony offense of UUW.

¶ 19    We also reject defendant's alternative argument that because section 24-1(a)(4) was declared unconstitutional in *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012), his conviction, which incorporates section 24-1(a)(4), cannot stand.[2] Defendant's argument fails because, as explained, his conviction is qualitatively different from that in *Moore*, as it incorporates an additional element—being within 1000 feet of a public park. This additional location element creates a separate offense from the offense at issue in *Moore*.

¶ 20              Constitutionality of Section 24-1(a)(4), (c)(1.5) of the UUW Statute

¶ 21    In holding a portion of the UUW statute unconstitutional, the circuit court of Kane County found the offense of possessing a firearm within 1000 feet of a public park (720 ILCS 5/24-1(a)(4), (c)(1.5) (West 2012)) violated defendant's right to keep and bear arms, as guaranteed by the second amendment to the United States Constitution. U.S. Const., amend. II. To answer the question presented, our analysis involves a two-part approach. *Mosley*, 2015 IL

---

[2] The *Moore* court remanded both consolidated cases for entry of a declaration of unconstitutionality and a permanent injunction but stayed its mandate for 180 days to permit the Illinois General Assembly to "craft a new gun law that will impose reasonable limitations, consistent with the public safety and the Second Amendment." *Moore*, 702 F.3d at 942. The stay was extended an additional 30 days to accommodate the General Assembly's legislative process in enacting the Firearm Concealed Carry Act. Pub. Act 98-63 (eff. July 9, 2013). On the same day the law became effective, defendants filed a motion to dismiss on the grounds that plaintiffs' claims were moot. *Shepard v. Madigan*, 958 F. Supp. 2d 996, 997 (S.D. Ill. 2013). The United States District Court for the Southern District of Illinois agreed with the defendants' motion, holding that the mandate's directive for a declaration of unconstitutionality and issuance of a permanent injunction was rendered moot by the enactment of the Firearm Concealed Carry Act. *Id.* at 1000. The Seventh Circuit Court of Appeals affirmed. *Shepard v. Madigan*, 734 F.3d 748, 752 (7th Cir. 2013). Neither the Firearm Concealed Carry Act nor the amended UUW statute is at issue in this case.

115872, ¶ 34 (citing *Wilson v. County of Cook*, 2012 IL 112026, ¶ 41). First, we conduct a textual and historical analysis of the second amendment "to determine whether the challenged law imposes a burden on conduct that was understood to be within the scope of the second amendment's protection at the time of ratification." *Id.* If the conduct falls outside of the scope of the second amendment, then the regulated activity "is categorically unprotected," and the law is not subject to further second amendment review. *Id.* But if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected, then we apply the appropriate level of heightened means-ends scrutiny and consider the strength of the government's justification for restricting or regulating the exercise of second amendment rights. *Id.* (citing *Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir. 2011) (*Ezell I*)).

¶ 22                               *Step One: Scope of the Regulated Activity*

¶ 23    The second amendment to the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const., amend. II. Through the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV), this right is "fully applicable to the States." *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

¶ 24    In *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), the United States Supreme Court determined that there is a guaranteed "individual right to possess and carry weapons in case of confrontation," based on the second amendment. However, *Heller* instructs that even though the second amendment guarantees an individual right to bear arms, that right is "not unlimited." *Id.* at 626. Specifically, the Court explained, in *dicta*, that its holding should not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* In a footnote, the Court emphasized that its list of "presumptively lawful regulatory measures" provided only examples and that the list did "not purport to be exhaustive." *Id.* at 627 n.26.

¶ 25    In *Moore*, 702 F.3d 933, the Seventh Circuit broadened *Heller* and *McDonald* by ruling that the offenses proscribed under sections 24-1(a)(4) and 24-1(a)(10) of the UUW statute (720 ILCS 5/24-1(a)(4), (10) (West 2010)) as well as the Class 4 form of section 24-1.6(a)(1), (a)(3)(A), (d) of the AUUW statute (*id.* § 1.6(a)(1), (a)(3)(A), (d)) were unconstitutional since they prohibited carrying ready-to-use firearms outside of a person's home. *Moore*, 702 F.3d at 942. The *Moore* court reached this conclusion after determining that the historical evidence supporting a tradition of public carriage of firearms was more persuasive than evidence to the contrary. See *id.* at 939 ("In sum, the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law."). Further, the court found that Illinois's blanket prohibition on carrying firearms in public "prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would." (Emphasis in original.) *Id.* at 940. The court, however, stated in contrast, "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need." *Id.*

¶ 26    Adopting the reasoning in *Moore*, this court in *People v. Aguilar*, 2013 IL 112116, ¶ 21, recognized that "the second amendment protects the right to possess and use a firearm for self-defense outside the home." As such, we held the offense set forth in section 24-1.6(a)(1), (a)(3)(A) of the AUUW statute, which prohibited carrying on one's person or in any vehicle, outside the home, an uncased, loaded, and immediately accessible firearm, to be unconstitutional on its face. *Id.* ¶¶ 21-22. Two years later, in *Mosley*, 2015 IL 115872, ¶ 25, we extended *Aguilar*'s finding of facial unconstitutionality to another portion of the AUUW statute, section 24-1.6(a)(2), (a)(3)(A) (720 ILCS 5/24-1.6(a)(2), (a)(3)(A) (West 2012)), which prohibited carrying an uncased, loaded, and immediately accessible firearm on a public way. Collectively, this court has held that the second amendment protects an individual's right to carry a ready-to-use gun outside the home, subject to certain regulations. *Mosley*, 2015 IL 115872, ¶ 25; *Aguilar*, 2013 IL 112116, ¶ 26. The question, then, is whether the offense of possessing a firearm within 1000 feet of a public park, as set forth under section 24-1(a)(4), (c)(1.5) of the UUW statute, impermissibly encroaches on conduct at the core of the second amendment.

¶ 27    The State argues that the conduct of possessing a firearm within 1000 feet of a public park is unprotected by the second amendment because the prohibition falls within *Heller*'s declaration that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" do not violate the second amendment rights of those prosecuted under such laws. *Heller*, 554 U.S. at 626. For support, the State cites various historical sources, chiefly the 1328 Statute of Northampton (Statute of Northampton 1328, 2 Edw. 3, c. 3 (Eng.)), to support its argument that possessing a firearm within 1000 feet of a public park is not a protected right.

¶ 28    Defendant, on the other hand, contends that regardless of whether a public park qualifies as a sensitive place, the 1000-foot firearm restriction surrounding a public park falls outside of *Heller*'s presumptively lawful restrictions. Defendant argues that the preposition "in," which precedes "sensitive places" in *Heller*'s statement, makes the list of presumptively lawful regulations limited to the actual sensitive place, not an exclusion zone around the particular place. Defendant finds support for his argument in *Moore*'s statement that "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places." Defendant claims that *Moore* supports his position that public spaces outside of the particular place are protected by the second amendment. Thus, he reasons that the conduct of possessing a firearm within 1000 feet of a public park does not meet one of *Heller*'s presumptively lawful regulatory measures. Defendant also notes the court in *Moore* rejected the various sources the State cites, including the fourteenth-century Statute of Northampton.

¶ 29    Beyond *Heller*'s two examples of "sensitive places," *i.e.*, "schools and government buildings," the Supreme Court has not yet provided a list of additional sensitive places that fall outside the second amendment protection or given any guidance on the breadth of its statement. Among the few cases that have specifically addressed *Heller*'s statement, we are unable to find a federal circuit case that has addressed a 1000-foot firearm restriction around a public park. Instead, most cases have been limited to laws restricting firearms within the disputed location. See *e.g.*, *United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) (holding that a defendant's conviction for possession of a loaded weapon in a motor vehicle on

national park land in violation of then-applicable regulations, did not violate his second amendment right to keep and bear arms).

¶ 30   We, however, need not address whether the 1000-foot firearm restriction falls outside of the ambit of the second amendment because we agree with the approach taken by other courts that assume some level of scrutiny must apply to *Heller*'s "presumptively lawful" regulations. See *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (explaining that courts should apply some level of scrutiny even to regulations identified in *Heller* as presumptively lawful); *Woollard v. Gallagher*, 712 F.3d 865, 875 (4th Cir. 2013) (stating that the court was not "obliged to impart a definitive ruling at the first step" but, rather, "deemed it prudent" to resolve some post-*Heller* challenges to firearm prohibitions at the second step), *cert. denied*, ___ U.S. ___, 134 S. Ct. 422 (2013); *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 204 (5th Cir. 2012) ("Although we are inclined to uphold the challenged federal laws [banning the sale of firearms to persons under the age of 21] at step one of our analytical framework, in an abundance of caution, we proceed to step two."). Accordingly, our analysis moves to the second step.

¶ 31                               *Step Two: Level of Scrutiny*

¶ 32   Although the *Heller* Court did not explicitly designate a level of scrutiny for evaluating second amendment restrictions (see *Heller*, 554 U.S. at 634 (acknowledging the dissent's criticism of the majority for not adopting a level of scrutiny)), the majority rejected the rational basis test, stating that it "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right," such as "the right to keep and bear arms." *Id.* at 628 n.27. As a result, courts generally recognize that *Heller*'s reference to any standard of scrutiny means any heightened level of scrutiny and not rational-basis scrutiny. See *Wilson v. County of Cook*, 2012 IL 112026, ¶ 42 (citing *Ezell I*, 651 F.3d at 702-04, *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010), *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010), and *Heller v. District of Columbia*, 670 F.3d 1244, 1251-53 (D.C. Cir. 2011) (*Heller II*)).

¶ 33   Defendant advocates for this court to apply strict scrutiny to the 1000-foot firearm restriction around a public park. Defendant argues that, since *Heller* declared the right to bear arms in self-defense to be a fundamental right, and this court in *Aguilar* and *Mosley* extended that right outside of the home and onto the public ways, the right to possess a firearm for self-defense outside the home is infringed when the 1000-foot firearm restriction around a public park extends onto public ways. Such a firearm restriction, he contends, directly impacts the second amendment protection of self-defense in public.

¶ 34   The State urges us to use intermediate scrutiny to uphold the statute's ban on possessing a firearm within 1000 feet of a public park. The State argues that the challenged restriction is substantially related to an important government objective in preventing harm to children and other vulnerable populations.

¶ 35   In any event, the Seventh Circuit, which this court has followed when analyzing second amendment challenges (see *Mosley*, 2015 IL 115872, ¶ 34; *Aguilar*, 2013 IL 112116, ¶ 20), teaches us that the argument is not strict versus intermediate scrutiny but rather how rigorously

to apply intermediate scrutiny to second amendment cases.[3] Under this approach, the second step of the inquiry requires the court to examine the strength of the government's justifications for restricting certain firearm activity by evaluating the restriction the government has chosen to enact and the public-benefits ends it seeks to achieve. *Ezell I*, 651 F.3d at 703; *Wilson*, 2012 IL 112026, ¶ 42. The Seventh Circuit stated in *Ezell I* that "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Ezell I*, 651 F.3d at 708. However, "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified." *Id.* Thus, the heightened means-end inquiry is a sliding scale that is neither fixed nor static. *Id.*; *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 934 (N.D. Ill. 2014).

¶ 36    On one end of the scale are cases that categorically restrict the possession of firearms by persons convicted of misdemeanor domestic violence (*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (*en banc*)) or convicted felons (*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010)).

¶ 37    In *Skoien*, an *en banc* decision, the Seventh Circuit considered the constitutionality of a federal law that forbids convicted domestic-violence misdemeanants from possessing firearms. 614 F.3d at 639. The defendant, who was twice convicted for misdemeanor crimes of domestic violence, challenged the statute's validity, in part on the basis of *Heller*. *Id.* The court rejected the defendant's reliance on *Heller*'s declaration of presumptive validity for longstanding prohibitions, holding the declaration was "precautionary language," intended only to "warn[ ] readers not to treat *Heller* as containing broader holdings than the Court set out to establish." *Id.* at 640. Following its own analytical route, the *Skoien* court concluded that it was possible for a "categorical limit on the possession of firearms" to be constitutional. *Id.* at 641. Applying what it characterized as "some form of strong showing," the court upheld the statute after finding it "substantially related to an important governmental objective." *Id.*

¶ 38    In *Williams*, the defendant was charged with possessing a firearm after an Indiana robbery conviction. 616 F.3d at 693. The defendant claimed the felon-in-possession statute violated his second amendment rights, while the government argued that the ban on possession of firearms by felons falls outside the scope of the second amendment because the restriction is one of the "presumptively lawful" regulatory measures specifically identified in *Heller*. *Id.* at 692-93. Despite *Heller*'s clear language, the Seventh Circuit explained that "the government does not

---

[3]We note that some federal circuits have used different approaches when addressing second amendment claims. For example, the Fourth Circuit Court of Appeals has applied a sliding scale approach and has applied a level of scrutiny based on the context of the restriction upon second amendment rights. *Masciandaro*, 638 F.3d at 470. The Second Circuit Court of Appeals has required a showing that the regulation "operate[s] as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)" before a heightened scrutiny is triggered. *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012). As stated, we elect to continue to follow the Seventh Circuit Court of Appeals. For a comprehensive overview of the various standards of review courts have applied in second amendment cases, see Nicholas J. Johnson, David B. Kopel, George A. Mocsary & Michael P. O'Shea, *Firearms Law and the Second Amendment Regulation, Rights, and Policy*, 903-83 (2d ed. 2018).

get a free pass" because "it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself." *Id.* at 692. After applying intermediate scrutiny, the *Williams* court found that the government had met its burden because the government's interest in keeping "firearms out of the hands of violent felons" was important because defendant's prior felony robbery conviction was violent and because taking away his right to possess a firearm was substantially related to the government's important interest. *Id.* at 692-94.

¶ 39    On the other end of the scale are cases dealing with a categorical ban on the second amendment right. For instance, in *Ezell I*, the plaintiffs sought a preliminary injunction against a City of Chicago ordinance that prohibited firing ranges within the city. 651 F.3d at 689-90. At the time, the City had a prerequisite of firing range training before people could exercise their core constitutional right to possess guns in their own home for self-defense. *Id.* at 691. However, the City had, at the same time, prohibited firing ranges within the city limits. *Id.* In reviewing the ordinance, the court indicated that the ban was "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708. The *Ezell I* court noted that plaintiffs were "the law-abiding, responsible citizens whose Second Amendment rights are entitled to full solicitude under *Heller*, and their claim comes much closer to implicating the core of the Second Amendment right." (Internal quotation marks omitted.) *Id.* After analyzing first amendment jurisprudence, which *Heller*, 554 U.S. at 582, and *McDonald*, 561 U.S. at 783, suggest is an appropriate analogue, the *Ezell I* court, as outlined above, set forth the scope of heightened means-end scrutiny when dealing with second amendment challenges:

> "First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right." *Ezell I*, 651 F.3d. at 708.

¶ 40    Applying this standard, the court reasoned that because the ordinance reached close to the core of the second amendment and curtailed the rights of all law-abiding citizens within its jurisdiction, the court had to apply "a more rigorous showing than that applied in *Skoien* *** if not quite 'strict scrutiny.' "[4] *Id.* The court took issue with the City's defense of the challenged regulation, which rested on sheer "speculation" about accidents and thefts from firing ranges. *Id.* at 709. For instance, the City had argued that gun ranges cause secondary harmful effects such as gun theft, fire hazards, and airborne lead contamination. *Id.* at 694. The court noted, however, that the City "produced no evidence to establish that these are realistic concerns, much less that they warrant a total prohibition on firing ranges." *Id.* at 709. The court concluded further that the City had not shown an extremely strong public-interest justification or a close fit between the government's means and its ends. Accordingly, the court granted the plaintiffs' request for a preliminary injunction. *Id.* at 709-10.

---

[4]The Seventh Circuit later held that laws that come near to the core of the second amendment right must satisfy "a strong form of intermediate scrutiny." *Ezell v. City of Chicago*, 846 F.3d 888, 893 (7th Cir. 2017).

¶ 41    After *Ezell I* was decided, the City responded by promulgating a new comprehensive regulatory scheme governing firing ranges, including licensing provisions, construction requirements, environmental regulations, and zoning restrictions for firing ranges. *Ezell v. City of Chicago*, 846 F.3d 888, 891 (7th Cir. 2017) (*Ezell II*). In a second round of litigation, plaintiffs returned to court mounting a facial attack on each of the City's regulations, generally contending that none of the ordinances can survive heightened constitutional scrutiny. *Id.* at 890. At issue were three zoning provisions that (1) allowed gun ranges only as special uses in manufacturing districts; (2) prohibited gun ranges within 100 feet of another range or within 500 feet of a residential district, school, place of worship, or multiple other uses; and (3) barred anyone under the age of 18 from entering a shooting range. *Id.*

¶ 42    Reviewing the revised provisions under the framework articulated in *Ezell I*, the court determined that the City must meet the requirement of establishing "a close fit between the challenged zoning regulations and the actual public benefits they serve—and to do so with actual evidence, not just assertions." *Id.* at 894. In striking down the City's revised zoning ordinance, the court stated that although the provisions did not create an outright ban, the new provisions "severely limit[ed] where shooting ranges may locate" so that "no publicly accessible shooting range yet exist[ed] in Chicago." *Id.* at 894-96. In fact, the court noted that the combined effect of the zoning regulations meant "only about 2.2% of the city's total acreage [is] even theoretically available to site a shooting range (10.6% of the total acreage currently zoned for business, commercial, and manufacturing use)." *Id.* As such, the court determined that the zoning regulations, "though not on their face an outright prohibition of gun ranges, nonetheless severely restrict the right of Chicagoans to train in firearm use at a range." *Id.* The court, therefore, found that the ordinance directly, and meaningfully, interfered with the ability of city residents to maintain firearms proficiency, a right found to be an "important corollary" to the core right to bear arms. (Internal quotation marks omitted.) *Id.* at 893. As in *Ezell I*, the *Ezell II* court rejected the City's "speculative claims of harm to public health and safety," which the court stated were "not nearly enough to survive the heightened scrutiny that applies to burdens on Second Amendment rights." *Id.* at 890.

¶ 43    In *Moore*, the Seventh Circuit applied *Ezell I*-like scrutiny to invalidate Illinois's blanket ban on the public carrying of firearms under the UUW and AUUW statutes. 702 F.3d 933. In doing so, the court conducted an analysis of Supreme Court jurisprudence, the history of the second amendment, and the plain meaning of the second amendment's language to find that, under *Heller* and *McDonald*, the second amendment's core right of armed self-defense extends past the four walls of the home and into public. *Id.* at 942. The *Moore* court reached this conclusion after determining that the Supreme Court's interpretation of the second amendment conferred a right to bear arms for self-defense, which the *Moore* court believed was as important outside the home as it was inside. *Id.* at 936 ("The right to 'bear' as distinct from the right to 'keep' arms is unlikely to refer to the home."). The court noted that "[a] blanket prohibition on carrying gun[s] in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would." (Emphasis in original.) *Id.* at 940. While, conversely, "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need." *Id.* Determining that

- 12 -

since the curtailment of gun rights concerned the entire law-abiding adult population of Illinois, the court stated that the State "would have to make a stronger showing" than in *Skoien*. *Id.*

¶ 44    Implementing the factors of a second amendment analysis, the *Moore* court went on to assess the State's public-safety rationales for banning public gun carriage, finding that the State's empirical evidence did not provide a justification for a complete public-carriage ban. Thus, the court held that the State failed to make an extremely strong showing that the law furthered public safety. *Id.* at 937-39, 942.

¶ 45    In sum, what is taught from these cases is that step two of our second amendment analysis begins with a balance of considerations where the quantity and persuasiveness of the State's evidence required to justify the challenged restrictions varies depending on how much it affects the core second amendment right to armed self-defense and whose right it affects. See *Ezell I*, 651 F.3d at 703. The rigor of this means-end analysis "depends on 'how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right.' " *Ezell II*, 846 F.3d at 892 (quoting *Ezell I*, 651 F.3d at 703). The closer in proximity the restricted activity is to the core of the second amendment right and the more people affected by the restriction, the more rigorous the means-end review. If the State cannot proffer evidence establishing both the law's strong public-interest justification and its close fit to this end, the law must be held unconstitutional. *Ezell I*, 651 F.3d at 703.

¶ 46    Applying this framework to the law at issue here requires an initial determination of where on the sliding scale of intermediate scrutiny the law should be analyzed. To answer this question, our first task is to determine the breadth of the law and the severity of its burden on the second amendment.

¶ 47    The State argues that prohibiting possession of a firearm within 1000 feet of a public park falls outside the core protection of the second amendment because it has no impact on the right to use arms "in defense of hearth and home" and is not a ban on carrying arms for self-defense in public. Rather, the State argues, it is a part of the well-established class of regulations that limit carriage in sensitive locations. Citing *Skoien*, the State maintains it is subject to plain intermediate scrutiny.

¶ 48    We believe the State defines the core right protected by the second amendment too narrowly. According to this court's holding in *Aguilar*, neither *Heller* nor *McDonald* expressly limited the second amendment protections to the home. *Aguilar*, 2013 IL 112116, ¶¶ 18-20. To the contrary, both *Heller* and *McDonald* at least strongly suggest that the second amendment right to keep and bear arms extends beyond the home. *Id.* ¶ 20. Moreover, the State's reliance on *Skoien*—which did not involve the core self-defense component of the right to bear arms—is misplaced. We find that the 1000-foot firearm restriction at issue more closely resembles the restrictions at issue in *Ezell I*, *Ezell II*, *Moore*, and *Aguilar*. In fact, the 1000-foot firearm restriction not only directly implicates the core right to self-defense, it does so more severely than the regulations at issue in the *Ezell* cases. That is so because section 24-1(a)(4), (c)(1.5) of the UUW statute prohibits the carriage of weapons in public for self-defense, thereby reaching the core of the second amendment, while in the *Ezell* cases, the laws only affected a right (maintain firearm proficiency) that was merely a "corollary" to the right to possess firearms for self-defense. Although the firearm restriction at issue is not a comprehensive statewide ban, like in *Moore* or *Aguilar*, the restriction is not minimal. The

firearm restriction not only covers a vast number of public areas across the state, it encompasses areas this court held in *Mosley* to be areas where an individual enjoys second amendment protection, *i.e.*, public ways. See *Mosley*, 2015 IL 115872, ¶ 25.

¶ 49　　As to the second variable on the sliding scale, the severity of the law's burden on the right, the law at issue affects the gun rights of the entire law-abiding population of Illinois like the laws in *Moore*, *Ezell*, *Aguilar*, and *Mosley*. As in those cases, the law functions as a categorical prohibition without providing an exception for law-abiding individuals. It is therefore a severe burden on the recognized second amendment right of self-defense.

¶ 50　　All of this suggests that elevated intermediate scrutiny should apply. And under this more rigorous review, the government bears the burden of showing a very strong public-interest justification and a close fit between the government's means and its end, as well as proving that the "public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights." *Ezell I*, 651 F.3d at 708-09. That means the State must establish a close fit between the 1000-foot firearm restriction around a public park and the actual public interests it serves.

¶ 51　　Turning to the State's proffered public-interest justifications, the State claims a compelling interest in public safety is served by reducing firearm possession within 1000 feet of a public park. In support, the State relies heavily on an analysis of school violence and the 1000-foot firearm ban surrounding schools. For instance, the State references the federal Gun Free School Zones Act of 1990, which restricts firearm possession within 1000 feet of school grounds. 18 U.S.C. § 921(a)(25) (2012). The State claims that it was in the atmosphere behind the passage of the Gun Free School Zones Act—a rise in school violence in the late 1980s—that the General Assembly passed the law extending the existing restriction on drugs within 1000 feet of schools, public parks, and public housing to also ban firearms from these locations. The State attempts to relate the reasoning behind the gun-free school zones to public parks, stating that because there is a substantial and distinctive interest in protecting those in parks due to a large number of children who frequent these places, prohibiting firearms near public parks is substantially related to the important government interest in protecting these children and others. According to the State, the goal of the 1000-foot firearm restriction around public parks is to extend the distance where a shooter might fire a weapon.

¶ 52　　We certainly accept the general proposition that preventing crime and protecting children are important public concerns. See *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted."). After all, "[g]uns are inherently dangerous instrumentalities." *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 419 (1990). The State, however, cannot simply invoke these interests in a general manner and expect to satisfy its burden.

¶ 53　　Just as in *Ezell I* and *II*, the State's propositions are devoid of any useful statistics or empirically supported conclusions. See *Ezell I*, 651 F.3d at 709 ("shoddy data or reasoning" and speculative claims are insufficient; there must be sufficient evidence to support the State's rationale. (Internal quotation marks omitted.)). First, the State cites data on school shootings from 1993 to 1999 purporting to show the pervasiveness of guns and violence in schools. It fails to connect these statistics to the challenged restriction in any meaningful way—it merely recites numbers and concludes that children need to be protected from gun violence. Secondly, the State cites data showing that, in Illinois between 1982 and 1991, there was an increase in

the number of juvenile arrests for both weapons violations and for murder by use of a firearm. Based on these statistics, the State concludes that "juvenile violence is inextricably linked to firearms." The State's third statistic merely provides that during the 1992-93 school years, 158 firearms "were confiscated on or near public school grounds in Chicago."

¶ 54    In sum, based on the record, the State provides no evidentiary support for its claims that prohibiting firearms within 1000 feet of a public park would reduce the risks it identifies. Without specific data or other meaningful evidence, we see no direct correlation between the information the State provides and its assertion that a 1000-foot firearm ban around a public park protects children, as well as other vulnerable persons, from firearm violence. The State merely speculates that the proximity of firearms within 1000 feet threatens the health and safety of those in the public park. The lack of a valid explanation for how the law actually achieves its goal of protecting children and vulnerable populations from gun violence amounts to a failure by the State to justify the restriction on gun possession within 1000 feet of a public park.

¶ 55    There is another flaw in the State's position. The State claims that the restriction is not overly burdensome because there are areas throughout Illinois where one could exercise the core second amendment right. Although this may be true, *Ezell II* found that despite the existence of areas where the shooting range restriction was constitutionally valid, that fact alone did not save the restriction because it nonetheless "severely restrict[ed] the right of Chicagoans." *Ezell II*, 846 F.3d at 894. Indeed an individual can preserve an undiminished right of self-defense by not entering one of the restricted areas. But the State conceded at oral argument that the 1000-foot firearm restriction zone around a public park would effectively prohibit the possession of a firearm for self-defense within a vast majority of the acreage in the city of Chicago because there are more than 600 parks in the city. See *About Us*, Chicago Park District, http://www.chicago parkdistrict.com/about-us/ (last visited Jan. 10, 2018). Aside from the sheer number of locations and public areas that would qualify under the law, not only in the city of Chicago, but throughout Illinois, the most troubling aspect is the lack of any notification where the 1000-foot restriction zone starts and where it would end. Innocent behavior could swiftly be transformed into culpable conduct if an individual unknowingly crosses into a firearm restriction zone. The result could create a chilling effect on the second amendment when an otherwise law-abiding individual may inadvertently violate the 1000-foot firearm-restricted zones by just turning a street corner. Likewise, in response to a question at oral argument, the State conceded that an individual who lives within 1000 feet of a public park would violate section 24-1(a)(4), (c)(1.5) every time that individual possessed a firearm for self-defense and walked to his or her vehicle parked on a public street. To remain in compliance with the law, the State said that the individual would need to disassemble his or her firearm and place it in a case before entering the restricted zone. This requirement, however, renders the ability to defend oneself inoperable and is in direct contradiction to this court's decisions in *Aguilar*, which recognized that the right to carry firearms for self-defense may be especially important when traveling outside of the home, and perhaps even more important than while at home. *Aguilar*, 2013 IL 112116, ¶¶ 19-20. Moreover, the State's proposition conflicts with *Heller*'s decision that struck down the requirement that firearms be kept "unloaded and disassembled or bound by a trigger lock" because it "makes it impossible for citizens to use them for the core lawful purpose of self-defense." (Internal quotation marks omitted.) *Heller*, 554 U.S. at 630. Thus, the State's suggestion runs counter to established law.

¶ 56    For these reasons, the State has not established the required means-end fit between the challenged law and its justifications.[5] Accordingly, we hold that possessing a firearm within 1000 feet of a public park in violation of section 24-1(a)(4), (c)(1.5) of the UUW statute is facially unconstitutional.

¶ 57                                    Severability

¶ 58    Having found the charged offense under section 24-1(a)(4), (c)(1.5) of the UUW statute unconstitutional, we must now consider whether the invalid provision in the statute is severable from the remaining provisions absent the invalid one. Resolving this issue involves a question of statutory construction, which first requires ascertaining and giving effect to the intent of the legislature by looking at either the statute's own specific severability provision, if one exists, or the Statute on Statutes' general severability provision (5 ILCS 70/1.31 (West 2012)). *In re Jordan G.*, 2015 IL 116834, ¶ 17.

¶ 59    Because the UUW statute at issue does not contain its own specific severability provision, pursuant to the Statute on Statutes (5 ILCS 70/1.31 (West 2012)), we must determine whether the invalid portion and the remaining portions of the statute are essentially and inseparably connected in substance, such that the General Assembly would not have passed the valid portions of the statute absent the invalid portion. *Mosley*, 2015 IL 115872, ¶ 30. The unconstitutional portion of a statute may be severed "if what remains is complete in and of itself, and is capable of being executed wholly independently of the severed portion." *Id.* We have the obligation of upholding the constitutionality of the remainder of the statute if reasonably possible. *People v. Sanders*, 182 Ill. 2d 524, 534 (1998).

¶ 60    As explained earlier, to convict a defendant of the Class 3 form of section 24-1(a)(4), (c)(1.5) of the UUW statute, the State must prove beyond a reasonable doubt the elements set forth in section 24-1(a)(4) and one of the several specific location factors in section 24-1(c)(1.5). 720 ILCS 5/24-1(a)(4), (c)(1.5) (West 2012). Possession of a firearm within 1000 feet of a public park is one of several specific locations that can operate in conjunction with the offense of section 24-1(a)(4) to comprise the substantive Class 3 form of the offense. *Id.* Other offenses in section 24-1(c)(1.5) include, "on any public way within 1,000 feet of the real property comprising any school, public park, courthouse, public transportation facility, or residential property owned, operated, or managed by a public housing agency or leased by a public housing agency as part of a scattered site or mixed-income development." *Id.* § 24-1(c)(1.5).

¶ 61    We find that the severability question in this case is similar to the issue in *Mosley* and *Jordan G.* In both cases, this court severed the unconstitutional provision, section 24-1.6(a)(3)(A), from the AUUW statute, finding that the remainder of the statute could be executed without the invalid provision because the provision operated only to criminalize possession of a loaded, uncased firearm in public. *Mosley*, 2015 IL 115872, ¶ 31; *Jordan G.*, 2015 IL 116834, ¶ 19. In doing so, we held that the other provisions in the AUUW statute of not possessing a valid Firearm Owner's Identification card or being under the age of 21 could

---

[5]We do not pass judgment on whether a less restrictive firearm zone regulation may satisfy court scrutiny if it were carefully crafted to serve public interests while at the same time upholding the constitutional right to bear arms in self-defense.

"stand independently without the inclusion of subsection factor (a)(3)(A)" because they criminalize other firearm violations. *Mosley*, 2015 IL 115872, ¶ 31; *Jordan G.*, 2015 IL 116834, ¶ 19.

¶ 62 The purpose of the UUW statute, like that of the AUUW statute, is to protect the police and public from dangerous weapons. *Mosley*, 2015 IL 115872, ¶ 31. Subsection (c)(1.5) continues to accomplish that aim with and without inclusion of the offense of possession of a firearm within 1000 feet of a public park. Although section 24-1(c)(1.5) is not drafted as clearly as the factors in the AUUW statute, our finding is supported by the fact that some of the other areas protected with 1000-foot restrictions under section 24-1(c)(1.5) were separately enacted. See, *e.g.*, Pub. Act 86-465 (eff. Jan. 1, 1990) (adding carriage ban in public housing to existing ban on carriage in schools); Pub. Act 87-930 (eff. Jan. 1, 1993) (adding carriage ban in public parks and creating carriage ban within 1000 feet of schools, public parks, and public housing); Pub. Act 88-156 (eff. July 28, 1993) (adding carriage ban within 1000 feet of courthouses); Pub. Act 96-41 (eff. Jan. 1, 2010) (adding carriage ban within 1000 feet of public transportation facility). As such, the history is indicative that the legislature intended for each separate location to be enforced wholly independently of the ban on carriage within 1000 feet of a public park. Removing this single location offense does not undermine the completeness of the remaining locations in section 24-1(c)(1.5). The remaining specific locations are capable of being executed without the offense of possessing a firearm within 1000 feet of a public park. We, therefore, find the unconstitutional portion of the statute at issue severable from the remaining portions of the statute.

¶ 63                                  Reinstatement of Nol-Prossed Charges

¶ 64 Finally, the State requests that if this court vacates defendant's conviction, we should revisit our recent decision in *People v. Shinaul*, 2017 IL 120162, in order to reinstate the charges it agreed to nol-pros as part of defendant's negotiated plea agreement. In *Shinaul*, we held that where the statute of limitations has run, it acts as an "absolute bar" on reinstating such charges following a defendant's successful motion to vacate a guilty plea. *Id.* ¶ 18. The State concedes that in light of *Shinaul*, the nol-prossed charges may not be reinstated because the three-year statute of limitations has run. We decline the State's invitation to revisit *Shinaul*.

¶ 65                                            CONCLUSION

¶ 66 For the reasons set forth above, we affirm the circuit court's judgment vacating defendant's Class 3 felony conviction of UUW in violation of section 24-1(a)(4), (c)(1.5) within 1000 feet of a public park, which we find to be unconstitutional. We vacate the circuit court's judgment to the extent that it declared portions of section 24-1(a)(4), (c)(1.5) of the UUW statute not at issue in this case unconstitutional.

¶ 67 Circuit court judgment affirmed in part and vacated in part.