# Illinois Official Reports

## Appellate Court

*People v. Green*, 2018 IL App (1st) 143874

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. QUOVADIS GREEN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-3874 |
| Filed | June 14, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-3725; the Hon. Timothy Chambers, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jessica D. Ware, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Leslie Billings, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Neville and Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant Quovadis Green, a security guard who possessed a valid Firearm Owner's Identification Card, was observed with a holstered weapon across the street from Senn High School on November 12, 2012. He was convicted of two counts of unlawful use of a weapon (UUW) for carrying a loaded, accessible firearm while on a public street and while in a vehicle. 720 ILCS 5/24-1(a)(4), (a)(10) (West 2010). Because he committed those offenses within 1000 feet of a school, he was sentenced on a Class 3 felony. *Id.* § 24-1(c)(1.5).

¶ 2      On appeal, Green argues that (1) the statute under which he was convicted is unconstitutional on its face under *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), *People v. Aguilar*, 2013 IL 112116, and *People v. Chairez*, 2018 IL 121417; (2) the evidence was insufficient to convict; and (3) one of his convictions should be vacated under the one-act, one-crime rule.

¶ 3                                    BACKGROUND

¶ 4      On November 20, 2012, around 3:15 p.m., Dan Svoboda, a teacher at Senn High School, observed a maroon van parked across the street from the school. Green was standing outside the van wearing a black security uniform. He appeared to be carrying a gun in a holster on his hip. Svoboda observed the gun twice over a 10-minute period.

¶ 5      Carter Carey, an assistant principal at Senn, also saw Green standing outside the van. Svoboda informed Carey that Green was carrying a gun. Carey then walked across the street to speak to Green, who had entered the passenger side of the van. Carey identified himself as the assistant principal of the school and stated that he had "some concerns." He asked Green whether he was a police officer, to which Green replied that he was a security guard. Carey then walked back across the street.

¶ 6      Svoboda called 911 and reported that Green had a gun. Before police arrived, Carey observed the van turn into an alley, come back northbound toward where he and Svoboda were standing, and park directly across from them on the east side of the street.

¶ 7      The parties stipulated that if called to testify, Officer Cannon would state that on November 20, 2012, he was on duty and received a 911 call regarding a man with a gun. When he arrived at the scene, he observed Green in the front passenger seat of a red van, wearing a security guard uniform and an empty holster. Searching the van, Cannon recovered (1) a magazine with 16 live rounds from the floorboard of the passenger seat and (2) a cooler next to the passenger seat with a Glock G17 pistol inside. The gun and magazine were sent to the crime lab, and it was determined that the gun was able to fire.

¶ 8      The parties further stipulated that Ray Schnoor, a Cook County State's Attorney Investigator, would testify that he measured the distance between Senn High School and where Green was parked to be 97 feet.

¶ 9      The trial court found Green guilty of two counts of UUW for possessing a loaded, accessible firearm in a vehicle (count I) and on a public street (count III). 720 ILCS 5/24-1(a)(4), (a)(10) (West 2010). Because the court found that Green committed these offenses within 1000 feet of a school, he was sentenced to one year of probation as a Class 3 felony offender.

¶ 10        Green filed a notice of appeal on November 21, 2014. Briefing was completed in May 2017 and argument was held in November 2017.[1] During argument, we raised with the parties the pending appeal in *Chairez* from an order of the trial court declaring unconstitutional a related provision prohibiting the carriage of firearms within 1000 feet of a public park. The parties acknowledged *Chairez*'s potential impact on the issues presented here, and the State suggested we postpone ruling in this case until *Chairez* was decided.

¶ 11        On February 1, 2018, our supreme court decided *Chairez*, 2018 IL 121417, where it found section 24-1(a)(4), (c)(1.5) of the Criminal Code of 1961 (Code) (720 ILCS 5/24-1(a)(4), (c)(1.5) (West 2012) (prohibiting the carriage of firearms within 1000 feet of a public park)) unconstitutional. The court severed the prohibition on carriage within 1000 feet of a park from the remainder of that section. Following the decision in *Chairez*, we ordered the parties to submit supplemental briefs on the decision's impact on this case.

¶ 12                                              ANALYSIS
¶ 13        The dispositive issue on appeal is the constitutionality of the 2012 version of section 24-1 of the Code,[2] which provides, in relevant part:

> "(a) A person commits the offense of unlawful use of weapons when he knowingly:
>
> * * *
>
> (4) Carries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode *** any pistol, revolver, stun gun or taser or other firearm, except that this subsection (a) (4) does not apply to or affect transportation of weapons that meet one of the following conditions:
>
> * * *
>
> (iii) are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card; or
>
> * * *
>
> (10) Carries or possesses on or about his person, upon any public street, *** any pistol, revolver, stun gun or taser or other firearm, except that this subsection (a)(10) does not apply to or affect transportation of weapons that meet one of the following conditions:
>
> * * *
>
> (iii) are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card.
>
> * * *
>
> (b) Sentence. A person convicted of a violation of subsection 24-1(a)(1) through (5), [or] subsection 24-1(a)(10) *** commits a Class A misdemeanor. ***

---

[1]The fact that it took two and a half years to complete briefing on this appeal is unacceptable.

[2]Subsections (a)(4) and (a)(10) were amended in 2015 to exclude weapons carried in accordance with the Firearm Concealed Carry Act by someone with a valid license under that act. Pub. Act 99-29 (eff. July 10, 2015) (amending 720 ILCS 5/24-1). Our analysis is limited to the pre-2015 version of the statute.

(c) Violations in specific places.

*** 

(1.5) A person who violates subsection 24-1(a)(4), 24-1(a)(9), or 24-1(a)(10) *** on any public way within 1,000 feet of the real property comprising any school, public park, courthouse, public transportation facility, or residential property owned, operated, or managed by a public housing agency or leased by a public housing agency as part of a scattered site or mixed-income development commits a Class 3 felony." 720 ILCS 5/24-1 (West 2012).

Green was convicted of one count of UUW for violating subsection (a)(4) and a second count for violating subsection (a)(10). These offenses would ordinarily be Class A misdemeanors, but because they were committed within 1000 feet of a school, they were enhanced to Class 3 felonies, per subsection (c)(1.5).

¶ 14 In his initial brief, Green argued that subsection (c)(1.5) was a sentencing enhancement, while the State maintained it was an element of the offense of UUW. In *Chairez*, the supreme court agreed with the State, holding that because the felony enhancement in section 24-1(c)(1.5) is a fact that must be proven *prior* to a guilty finding, it is an element of the offense. *Chairez*, 2018 IL 121417, ¶¶ 17-18. As such, the offense of "UUW within 1000 feet of a school" is distinct from the offense of UUW, which the Seventh Circuit found unconstitutional in *Moore*, 702 F.3d at 942. Accordingly, we must separately analyze the constitutionality of section 24-1(c)(1.5) as it applies to this separate offense.

¶ 15 All statutes are presumed constitutional, and the party bringing a constitutional challenge bears the burden of rebutting that presumption. *People v. Greco*, 204 Ill. 2d 400, 406 (2003). Our review of the constitutionality of a statute is *de novo*. *People v. Hauschild*, 226 Ill. 2d 63, 83 (2007). If reasonably possible, we must construe the statute to affirm its constitutionality and validity. *Greco*, 204 Ill. 2d at 406.

¶ 16 Our supreme court has adopted a two-step framework for analyzing a second amendment challenge. *In re Jordan G.*, 2015 IL 116834, ¶ 22. First, we must consider whether the restricted activity is protected by the second amendment. *Id.* If we answer this question in the affirmative, only then do we proceed to the second step of the inquiry, which involves applying "the appropriate level of scrutiny" and considering the strength of the state's justification for regulating or restricting the activity. *Id.*

¶ 17 In its supplemental brief, the State concedes that laws regulating the carriage of weapons near sensitive places are not necessarily outside the scope of the second amendment (see *Chairez*, 2018 IL 121417, ¶ 30), so we turn to step two of the inquiry, which requires us to evaluate the statute under the appropriate level of scrutiny (see *In re Jordan G.*, 2015 IL 116834, ¶ 22).

¶ 18 Green argued for the application of strict scrutiny in his opening brief, but the supreme court rejected that standard in *Chairez*. Instead, the court held that second amendment challenges were subject to intermediate scrutiny, but how "rigorously" to apply that scrutiny depends on "how much [the challenged restriction] affects the core second amendment right to armed self-defense and whose right it affects." *Chairez*, 2018 IL 121417, ¶¶ 35, 45. The court found that the 1000-foot firearm restriction surrounding public parks implicated the "core right to self-defense" and affected "the gun rights of the entire law-abiding population of Illinois." *Id.* ¶¶ 48-49. Accordingly, the court applied "elevated intermediate scrutiny" to the challenged

regulation, holding that the State had the burden to show a "very-strong" public-interest justification for the regulation and a close fit between the law's means and its ends. *Id.* ¶ 50.

¶ 19　　At oral argument, the State suggested that it is inconsistent to hold that Green, as the appellant and the party challenging the constitutionality of the statute, bears the burden to prove it is unconstitutional, but adhere to *Chairez*'s holding that the State must still show a close fit between the statute's means and ends. The State contends its status as appellee in this case renders that burden-shifting inappropriate. While the State did not raise this argument in its briefs, resulting in forfeiture (Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018)), we nevertheless address it only to note that we do not find an inconsistency (*Johnson v. Johnson*, 386 Ill. App. 3d 522, 533-34 (2008) (waiver is limitation on parties, not on courts)). Generally, the burden of proving unconstitutionality rests with the party challenging the constitutionality of the statute (*Chairez*, 2018 IL 121417, ¶ 15), but where, as here, the statute implicates a "core right," namely, the right of law-abiding citizens to bear arms in public for self-defense, the State has the burden to show the necessary justification for the restriction on that right (see *id.* ¶¶ 48, 50). And the State must satisfy that burden regardless of whether it is the appellant or the appellee in the case.

¶ 20　　Here, just as in *Chairez,* the State's public-interest justification for the firearm restriction within 1000 feet of a school is to prevent crime and protect children, both of which the supreme court acknowledged are "important public concerns." *Id.* ¶ 52. The State argues that the 1000-foot ban is closely tailored to meet this goal, citing various statistics in support of its proposition. For example, the State points out that between 1988 and 1989, immediately before the UUW statute was first enacted, 8 elementary school students were killed and 43 people were injured in school shootings. See Amy Hetzner, *Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms*, 95 Marq. L. Rev. 359, 360 (2011). And in the 1992-93 school year, after the UUW statute was enacted, 158 guns were confiscated on or near public school grounds in Chicago. *Id.* at 385 (citing Andrew Gottesman, *Guns are Shattering Quiet Around Schools in Suburbs*, Chi. Trib. (Sept. 23, 1993)). This trend has not abated in recent years, as a Department of Justice study estimated that between 2007 and 2011 approximately 12,600 acts of gun violence occurred in schools in the United States. Michael Planty & Jennifer L. Truman, Bureau of Just. Stat., Special Report: Firearm Violence, 1993-2011, at 8 (2013), https://www.bjs.gov/content/pub/pdf/fv9311.pdf. And recent events only underscore this alarming trend. See, *e.g.*, Manny Fernandez, *In Texas School Shooting, 10 Dead, 10 Hurt and Many Unsurprised*, N.Y. Times (May 18, 2018), https://www.nytimes. com/2018/05/18/us/school-shooting-santa-fe-texas.html; Audra D.S. Burch & Patricia Mazzei, *Death Toll Is at 17 and Could Rise in Florida School Shooting*, N.Y. Times (Feb. 14, 2018), https://www.nytimes.com/2018/02/14/us/parkland-school-shooting.html; Matthew Haag, *Maryland School Gunman Confronted by Officer Shot Himself, Authorities Say*, N.Y. Times (Mar. 26, 2018); *Kentucky School Shooting: 2 Students Killed, 18 Injured*, CNN (Jan. 24, 2018), https://www.cnn.com/2018/01/23/us/kentucky-high-school-shooting/index.html.

¶ 21　　Significantly, the supreme court rejected the relevance of this identical data in *Chairez,* stating "we see no direct correlation between the information the State provides and its assertion that a 1000-foot firearm ban around a public park protects children, as well as other vulnerable persons, from firearm violence. The State merely speculates that the proximity of firearms within 1000 feet threatens the health and safety of those in the public park." *Chairez,*

2018 IL 121417, ¶ 54. The State's arguments here are based on the same rationale rejected in *Chairez*.

¶ 22 To be sure, the data the State provides more directly relates to gun violence in schools, but the State still fails to show that the 1000-foot firearm ban mitigates that violence. The data does not reflect that the gun violence plaguing our schools was perpetrated within 1000 feet of the schools (as opposed to inside the schools themselves) or that the perpetrators of that violence were the law abiding adults whose conduct the statute regulates. Accordingly, the State has not shown a close fit between the restriction on gun possession within 1000 feet of a school and the protection of children. See *id.*

¶ 23 In arguing to the contrary, the State cites *Heller*, in which the Supreme Court stated that nothing in its opinion "should be taken to cast doubt on *** laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," which it described as "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). But the State conflates regulations banning the carriage of weapon*s in* certain sensitive places (*e.g.*, schools and government buildings) with subsection (c)(1.5), which bans carriage *near* those places. This distinction is significant. A ban on firearms *in* specific places imposes less of a burden on the right to bear arms than one that extends to an area of approximately three city blocks *around* those same places. While a gun owner can simply choose not to enter locations deemed sensitive, it is manifestly more difficult to avoid areas within 1000 feet of those locations, particularly given that there is no notification where the restriction zone begins or ends. Indeed, the ban at issue here, just as the ban 1000 feet around public parks at issue in *Chairez*, effectively operates as a total ban on the carriage of weapons for self-defense outside the home in Chicago. See *Chairez*, 2018 IL 121417, ¶ 55.[3] As such, it runs afoul of *Aguilar*, in which the supreme court held that the right to carry firearms is particularly important when traveling outside the home. *Id.* (citing *Aguilar*, 2013 IL 112116, ¶¶ 19-20).

¶ 24 For these reasons, we conclude that sections 24-1(a)(4), (c)(1.5) and 24-1(a)(10), (c)(1.5), prohibiting possession of a firearm within 1000 feet of a school are facially unconstitutional. We further hold that this portion of the challenged statute is severable from the remaining provisions of the statute. See *id.* ¶ 62.

¶ 25 Our holding today is narrow in that it addresses only the pre-2015 version of the UUW statute. The current version of the statute excepts from its reach those who have a valid license under the Firearm Concealed Carry Act. 720 ILCS 5/24-1(a)(4)(iv) (West 2016). Significantly, the Firearm Concealed Carry Act continues to prohibit the possession of firearms in "[a]ny building, real property, and parking area under the control of a public or private elementary or secondary school" (430 ILCS 66/65(a)(1) (West 2016)), even for those with valid licenses. At oral argument, counsel for Green did not take issue with the reasonableness of these prohibitions. And so the limited issue presented here is what burdens the legislature may impose on the rights of law-abiding citizens to bear arms on public ways adjacent to school property.

¶ 26 Illinois law, as it presently stands, contains no provisions that define a perimeter around sensitive places, like parks and schools, where even those authorized to carry weapons in public may not enter. If not addressed, the price of the right of law-abiding citizens to carry weapons in public will render it necessary to make fortresses out of places like schools,

---

[3]There are, in fact, comparatively fewer parks (600) than schools (951) in the city of Chicago.

hospitals, churches, and public housing, with little positive effect on public safety. A bullet fired by an armed security guard can as easily kill a child, patient, or worshiper as one fired by a criminal. And although Green was lawfully authorized to carry a weapon, we can conceive of no reason why his right to do so should outweigh the State's interest in the safety of school children on public ways adjacent to school property, particularly at dismissal time. It is imperative for the legislature to undertake a nuanced, evidence-based study of measures designed to protect our citizens from gun violence in the vicinity of sensitive public places without unnecessarily burdening the exercise of the second amendment rights of those lawfully authorized to carry weapons in public.

¶ 27                                               CONCLUSION

¶ 28        Because we agree with Green's contention that the statute under which he was convicted is unconstitutional, we reverse his convictions for unlawful use of a weapon and we need not address his remaining arguments regarding the sufficiency of the evidence or the violation of the one-act, one-crime rule.

¶ 29        Reversed.