2025 IL App (1st) 240917

FIFTH DIVISION
August 8, 2025

No. 1-24-0917

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| v. | ) | |
| | ) | No. 10 CR 14529 |
| TERRENCE TEMPLE, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Thomas J. Hennelly |
| | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Mitchell and Navarro concurred in the judgment and opinion.

**OPINION**

¶ 1     The defendant, Terrence Temple, appeals from the circuit court's denial of his petition for

relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS

5/2-1401 (West 2022)). He argues that his 2010 conviction for unlawful use of a weapon (UUW)

in a public park is void because the statute under which he was convicted is facially

unconstitutional under the second amendment, as interpreted by the United States Supreme Court

in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and other recent cases. For the

following reasons, we affirm the judgment of the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3     The State charged Mr. Temple with one count of UUW for possessing a loaded and

immediately accessible firearm in a public park (720 ILCS 5/24-1(a)(10), (c)(1.5) (West 2010)),

six counts of aggravated unlawful use of a weapon (AUUW) (*id.* § 24-1.6(a)(1), (a)(3)(A); (a)(1),

(a)(3)(C); (a)(1), (a)(3)(I); (a)(2), (a)(3)(A); (a)(2),(a)(3)(C); (a)(2), (a)(3)(I)), and one count of

unlawful possession of a firearm while under the age of 18 (*id.* § 24-3.1(a)(1)), all in connection with an incident occurring on July 11, 2010.

¶ 4    Following a conference held pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 1997), Mr. Temple pleaded guilty on September 3, 2010, to a single count of UUW based on his possession of a firearm in a public park. The court accepted what had been presented at the Rule 402 conference, a transcript of which does not appear in the record, as a sufficient factual basis for the plea and sentenced Mr. Temple to one year in the Impact Incarceration Program, Cook County's boot camp program. Mr. Temple did not successfully complete boot camp, and on January 21, 2011, the court resentenced him to two years in the Illinois Department of Corrections, followed by one year of mandatory supervised release. Mr. Temple did not move to vacate his guilty plea within 30 days and did not pursue a direct appeal.

¶ 5    On December 6, 2023, Mr. Temple challenged his UUW conviction in a *pro se* petition for relief under section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2022)). Mr. Temple relied on this court's decision in *People v. Casarrubias*, 2018 IL App (1st) 163000-U, ¶ 10, in which we held that a guilty plea based on a statute prohibiting the possession of a firearm within 1,000 feet of a park—a provision that was later found unconstitutionally broad in *People v. Chairez*, 2018 IL 121417, ¶ 56—should be vacated.

¶ 6    The State moved to dismiss Mr. Temple's petition, arguing that while certain sections of the Illinois criminal code that had operated as a categorical ban on the possession of operable firearms outside the home had been held facially unconstitutional by our supreme court in *People v. Aguilar*, 2013 IL 112116, ¶ 22, Mr. Temple was convicted under a different provision (see 720 ILCS 5/24-1(a)(10), (c)(1.5) (West 2010) (the public places prohibition)), which only prohibits the possession of loaded and immediately accessible firearms within certain public venues, including

public parks. The State pointed out that, in *People v. Bell*, 2018 IL App (1st) 153373, ¶ 30, this court had expressly distinguished *Chairez* and held that the public places prohibition of the UUW statute remained a valid regulation under the second amendment.

¶ 7      The circuit court heard arguments on March 29, 2024, and denied Mr. Temple's petition that same day. The court concluded that while *Aguilar* did render some firearms convictions void, its holding did not apply to Mr. Temple's conviction. "[I]t wasn't simply just carrying a gun," the court explained, "it was carrying a gun in a public park."

¶ 8      Mr. Temple now appeals.

¶ 9                                    II. JURISDICTION

¶ 10      The circuit court denied Mr. Temple's section 2-1401 petition on March 29, 2024, and Mr. Temple filed a timely notice of appeal from that ruling on April 23, 2024. This court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 304(b)(3) (eff. Mar. 8, 2016), which governs appeals from "judgment[s] or order[s] granting or denying any of the relief prayed in a petition under section 2-1401 of the Code of Civil Procedure."

¶ 11                                    III. ANALYSIS

¶ 12      Section 2-1401 of the Code establishes a statutory procedure for a party seeking to vacate a final judgment, including a criminal conviction, that was entered more than 30 days prior. 735 ILCS 5/2-1401 (West 2022). A section 2-1401 petition must generally be filed within two years of a final judgment. *People v. Pinkonsly*, 207 Ill. 2d 555, 564 (2003). However, void judgments may be challenged at any time. *People v. Price*, 2016 IL 118613, ¶ 30. Our supreme court has recognized that a judgment based on a facially unconstitutional statute is void *ab initio*. *People v. Thompson*, 2015 IL 118151, ¶ 32. Accordingly, Mr. Temple's facial challenge to the UUW statute's public places prohibition was not time-barred. It was also not barred by the fact that he

3

pled guilty, as a guilty plea does not preclude a defendant from challenging his conviction as void. *People v. Guevara*, 216 Ill. 2d 533, 542-43 (2005).

¶ 13    When challenging the constitutionality of a statute, a petitioner may assert either a facial challenge, an as-applied challenge, or both. See *Thompson*, 2015 IL 118151, ¶ 36. An as-applied challenge is a claim that a statute is unconstitutional in the specific circumstances of the challenger's case. *Id.* A facial challenge is a claim that a statute is unconstitutional in all possible applications. *Id.* Because "a facial challenge must fail if *any* situation exists where the statute could be validly applied," it is the most difficult to mount successfully. (Emphasis added.) *People v. Davis*, 2014 IL 115595, ¶ 25.

¶ 14    Here, Mr. Temple's section 2-1401 petition is framed solely as a facial challenge to the constitutional validity of that portion of the UUW statute's public places prohibition banning loaded and immediately accessible firearms in public parks, which he argues is contrary to the second amendment. That amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

¶ 15    We found this ban on the possession of a firearm in a public park did not violate the second amendment in 2018 in *Bell*, 2018 IL App (1st) 153373, ¶ 30. However, as Mr. Temple points out, the United States Supreme Court's second-amendment jurisprudence has evolved since then, and our analysis in *Bell* relied on a means-end analysis which was later rejected by that Court. We briefly trace this evolution and explain why, notwithstanding these changes, we continue to find that the restriction on operable guns in public parks does not violate the second amendment.

¶ 16            A. Second-Amendment Challenges Under *Heller* and *McDonald*

¶ 17    In *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the United States Supreme

Court held that the second amendment protects an individual's right to keep and bear arms for self-defense. This decision marked the Court's first clear and direct ruling that the right is not limited to participation in an organized militia. The Court, however, noted that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. It emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626-27. The Court described these prohibitions as "presumptively lawful regulatory measures," and noted that they were only examples and did not constitute an exhaustive list of permissible regulations under the second amendment. *Id.* at 627 n.26.

¶ 18    Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010), the Court held that the second-amendment right to bear arms was "fully applicable to the States" through the fourteenth amendment's incorporation doctrine. The Court explained that this holding would "not imperil every law regulating firearms," and "repeat[ed] [its] assurances" that restrictions on carrying firearms in sensitive locations remain valid. *Id.* at 786.

¶ 19    In the years following *Heller* and *McDonald*, courts, including our own supreme court (see *Chairez*, 2018 IL 121417, ¶ 21), followed a two-step framework for assessing second-amendment challenges. Step one of that framework employed "a textual and historical analysis of the second amendment to determine whether the challenged law impose[d] a burden on conduct that was understood to be within the scope of the second amendment's protection at the time of ratification." (Internal quotation marks omitted.) *Id.* If so, courts moved to step two and "appl[ied] the appropriate level of heightened means-ends scrutiny," considering "the strength of the government's justification for restricting or regulating the exercise of second amendment rights."

*Id.* (citing *Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir. 2011)).

¶ 20    Employing this test in 2018, our supreme court held in *Chairez* that a provision of the UUW statute prohibiting the possession of a firearm within 1,000 feet of a public park was facially unconstitutional, both because the State had failed to provide any data demonstrating that the prohibition would reduce the risks to the public that it had identified and because the regulation "would effectively prohibit the possession of a firearm for self-defense within a vast majority of the acreage in the city of Chicago." *Id.* ¶¶ 54-56. That same year, this court rejected a challenge to the precise regulation at issue here, the portion of the UUW statute's public places prohibition banning firearms *within* public parks. See *Bell*, 2018 IL App (1st) 153373, ¶ 24. We concluded, based on the same two-part test, and with the focus in part two of that test on means-ends scrutiny, that public parks, " 'where large numbers of people, including children, congregate for recreation,' " justified " 'reasonable measures to secure public safety,' " and that the regulation did not have the same sweeping effect on the right to possess a firearm as the regulation at issue in *Chairez*. *Id.* ¶¶ 29-30 (quoting *United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011)).

¶ 21                    B. The *Bruen* Court's New Historical Test

¶ 22    Returning to the subject over a decade after its decisions in *Heller* and *McDonald*, the United States Supreme Court in *Bruen*, 597 U.S. at 19-24, concluded that the means-ends scrutiny constituting the second part of this prevailing test was inconsistent with the approach it had taken in *Heller*. The Court introduced a new two-step framework "rooted in the Second Amendment's text, as informed by history." *Id.* at 19. Under this framework, a court must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If so, "the Constitution presumptively protects that conduct." *Id.* To rebut that presumption, at step two,

"[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

¶ 23    The *Bruen* Court identified two kinds of historical inquiries that might take place at step two. See *id.* at 26-27. If the societal problem addressed by the firearm regulation is an enduring one that has persisted since the country's founding, courts apply the "fairly straightforward" standard. *Id.* at 26. If the regulation instead addresses a modern societal concern or a significant technological change, a "more nuanced" approach is required. *Id.* at 27.

¶ 24    The Court explained that it had applied the first of these two historical approaches, the "fairly straightforward" one, years earlier in *Heller*, where the challenged regulation " 'totally ban[ned] handgun possession in the home.' " *Id.* at 26-27 (quoting *Heller*, 554 U.S. at 628). The District of Columbia had justified the ban as a response to gun violence in densely populated communities. *Id.* That was a societal problem that also existed at the founding of our country and could have been addressed by the founders. *Id.* After considering " 'founding-era historical precedent,' " including " 'various restrictive laws in the colonial period,' " the Court found no analogue to a total ban on handguns in the home and held the regulation unconstitutional. *Id.* (quoting *Heller*, 554 U.S. at 631).

¶ 25    The statute at issue in *Bruen* was a New York regulation requiring applicants for a public carry license to demonstrate "proper cause"—a special need for self-defense distinguishable from that of the general community—to obtain an unrestricted license to carry a handgun in public. *Bruen*, 597 U.S. at 12. Because the regulation "concern[ed] the same alleged societal problem addressed in *Heller*: 'handgun violence,' primarily in 'urban area[s]," the Court in *Bruen* applied the same "fairly straightforward" historical analysis. *Id.* at 26-27 (quoting *Heller*, 554 U.S. at 634). It examined "whether 'historical precedent' from before, during, and even after the founding [of

the country] evinces a comparable tradition of regulation." *Id.* at 27 (quoting *Heller*, 554 U.S. at 631). The Court was strict in its demand for a distinctly similar regulation that could justify New York's "proper cause" requirement and, in light of the substantially conflicting historical evidence, rejected defendants' efforts to make that showing based on a few isolated regulations. See *id.* at 11, 39-70.

¶ 26 Most recently, in *United States v. Rahimi*, 602 U.S. 680, 690-92 (2024), the Court rejected an as-applied challenge to a federal statute temporarily prohibiting individuals subject to domestic violence restraining orders from possessing firearms. The Court used that case to clarify that the second amendment permits more than "just those regulations identical to ones that could be found in 1791." *Id.* at 691-92. The Court emphasized that its "precedents were not meant to suggest a law trapped in amber." *Id.* at 691. And it made clear that although the challenged regulation must be "consistent with the principles that underpin our regulatory tradition," it "need not be a 'dead ringer' or a 'historical twin.' " *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30).

¶ 27 The *Bruen* Court also provided specific guidance—relevant here—on how to apply its "more nuanced" approach, when identifying "*new* and analogous sensitive places." (Emphasis in original.) 597 U.S. at 27, 30-31. The Court reinforced the recognition in *Heller* that prohibiting firearms in some sensitive places—which the *Heller* Court had said included "schools and government buildings" (*Heller*, 554 U.S. at 626)—did not violate the second amendment. The *Bruen* Court explained that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses," no historical disputes questioned the validity of those laws. *Bruen*, 597 U.S. at 30 (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229-36, 244-

47 (2018); Brief of *Amicus Curiae* the Independent Institute in Support of Petitioners at 11-17 (No. 20-843), 2021 WL 3127146). This lack of controversy supported the designation of those venues as "sensitive places" where gun regulation was clearly constitutional. *Id.*

¶ 28    The *Bruen* Court invited future courts to rely on these undisputed historical analogues when evaluating the constitutionality of modern firearm regulations in comparable settings, saying: "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* That invitation underlies our analysis of this case.

¶ 29                    C. The Second Amendment and Public Parks

¶ 30    While this court found the UUW statute's restriction on loaded and immediately accessible firearms valid in *Bell*, 2018 IL App (1st) 153373, ¶ 24, it appears that no reviewing court in Illinois has revisited the validity of that restriction after the Court's decisions in *Bruen* and *Rahimi*. We thus look to decisions from other courts for persuasive guidance in determining whether such restrictions may still be upheld. See *Carroll v. Curry*, 392 Ill. App. 3d 511, 517 (2009) (explaining that "the use of foreign decisions as persuasive authority is appropriate where Illinois authority on point is lacking or absent").

¶ 31    The United States Courts of Appeals for the Ninth and Second Circuits recently undertook their own extensive analyses of this question in *Wolford v. Lopez*, 116 F.4th 959, 979 (9th Cir. 2024), *pet. for cert. filed* (April 3, 2025), and *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025). The *Wolford* court was reviewing statutes in Hawaii and California that, like the UUW statute at issue here, prohibited the carrying of firearms in public parks. The case was before the court on review of two preliminary injunctions. The court analyzed the restrictions under *Bruen* and *Rahimi* and determined that those laws were presumptively

constitutional. See *Wolford*, 116 F.4th at 971, 973-74.

¶ 32    In *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, 144 S. Ct. 2709 (2024), the Second Circuit reviewed numerous challenges to provisions of New York's Concealed Carry Improvement Act. Finding the act's prohibition on carrying firearms in public parks to be presumptively constitutional, the Court reversed the lower court's grant of a preliminary injunction. On remand from the United States Supreme Court following *Rahimi*, the Second Circuit reaffirmed that decision in *Antonyuk*, 120 F.4th at 1026.

¶ 33    The court in *Wolford* began by noting that, with respect to sensitive places, the concerns of establishing a historical tradition are diminished because "[o]ur Nation has a clear historical tradition of banning firearms at sensitive places." *Wolford*, 116 F.4th at 980 (citing *Bruen*, 597 U.S. at 30; *McDonald*, 561 U.S. at 786 (plurality opinion); and *Heller*, 554 U.S. at 626). However, the founders did not have a rigid conception of what *kinds* of places qualified as sensitive. *Id.* Reflecting *Bruen*'s instruction, the *Wolford* court offered a practical framework for evaluating whether a location qualifies as a "sensitive place."

¶ 34    For places that existed at the time of our country's founding, it is sufficient for the government to identify historical regulations that are similar in number and timeframe to those the Supreme Court cited when designating locations like legislative assemblies, polling places, and schools as sensitive. See *id.* at 985-87. For newer places that assumed their modern form only after the founding, a court must determine whether there are "regulations that are analogous to the regulations cited by the Court, taking into account that it is illogical to expect a government to regulate a place before it existed in its modern form." *Id.* at 980. After all, the Ninth Circuit noted, "it makes little sense to ask whether the Founders regulated firearms at nuclear power plants." *Id.*

¶ 35    As the *Wolford* court noted, historical regulations need not be an exact match to the challenged law; they must simply reflect a principle that underlies our nation's historical tradition of regulating firearms in places meaningfully similar to those at issue. *Id.* at 980-81 (citing *Rahimi*, 602 U.S. at 692). The *Wolford* court explained that a key factor in this analysis "is whether the constitutionality of the historical regulations was disputed." *Id.* at 981. If it was, that dispute may weigh in favor of a challenge to the analogous new law, especially if historical evidence supporting the law is weak. *Id.* Conversely, if the constitutionality of historical laws went unchallenged or was unanimously upheld in early American courts, that weighs in favor of their constitutionality. *Id.* In sum,

> "one way that Defendants can show a historical tradition is by establishing that, when a type of place first arose, or first arose in modern form, states and municipalities began to regulate the possession of firearms at that type of place, the regulations were considered constitutional at the time, and the regulations were comparable to a tradition of regulating a similar place or places in the earlier years of the Nation." *Id.*

¶ 36    Applying this framework, the *Wolford* court began by defining parks in their modern form as "outdoor gathering places where people engage in social, political, and recreational activities." *Id.* at 982. It emphasized that parks matching this definition did not begin to emerge until the mid-nineteenth century. See *id.* And from the moment modern public parks came into existence, municipalities across the country began enacting firearm prohibitions specific to those spaces. *Id.* For example, in 1858, the year Central Park opened, New York City banned the carrying of firearms within the park. *Id.* The court further found that between 1866 and 1898, around 24 municipalities or major cities enacted laws prohibiting the carrying of firearms in all public parks. *Id.* at 982-83.

¶ 37    Importantly, the state governments in *Wolford* could not identify, and the court could not locate, *any* evidence suggesting that those historical restrictions were ever challenged as unconstitutional. *Id.* at 983. Given this pattern of early and uncontested regulation, the Ninth Circuit, joining the Second Circuit and several district courts—see *Antonyuk*, 89 F.4th at 355-63; *Kipke v. Moore*, 695 F. Supp. 3d 638, 654-55 (D. Md. 2023); *Maryland Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 585-88 (D. Md. 2023)—concluded that the nation's historical tradition supported regulations banning firearms in public parks. *Wolford*, 116 F.4th at 983. *Contra Koons v. Platkin*, 673 F. Supp. 3d 515, 639-42 (D.N.J. 2023); *Springer v. Grisham*, 704 F. Supp. 3d 1206, 1214-18 (D.N.M. 2023)

¶ 38    Additionally, the *Wolford* court noted that the United States Supreme Court had specifically "designated schools as sensitive places" and that "[t]he numerous historical laws prohibiting the carry of firearms in parks share some of these characteristics and similarly support designating parks as sensitive places." *Id.* Thus, the *Wolford* court relied both on the fact that when modern parks came into existence laws banning guns in parks were enacted without constitutional challenge and the fact that modern parks are analogous to schools, which the Supreme Court has specifically listed as "sensitive places" in which firearms can be constitutionally regulated.

¶ 39    The Second Circuit had reached the same result in *Antonyuk*, though it relied on a slightly different analysis. The court focused on the nation's historical tradition of regulating firearms in crowded public forums, such as fairs and markets, and reasoned that urban parks were simply modern iterations of such spaces. *Antonyuk*, 120 F.4th at 1018-24. Because public forums existed at the founding, the court applied the "fairly straightforward" historical inquiry and upheld the restrictions under that standard. *Id.* at 1024-26.

¶ 40                                D. Mr. Temple's Facial Challenge

¶ 41    The parties here agree, under the first prong of *Bruen*, that the plain text of the second amendment covers the conduct made unlawful by the UUW statute's prohibition on gun possession in a public park. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 87 (recognizing that possessory firearms offenses satisfy the first prong of the *Bruen* analysis). Mr. Temple argues that the State has failed to meet its burden, under the second prong of the *Bruen* test, of demonstrating a consistent historical practice of criminalizing the possession of firearms for self-defense in public parks.

¶ 42    The central question, as in *Wolford* and *Antonyuk*, is whether public parks belong on the nonexhaustive list of places, such as schools, polling locations, and government buildings, that the United States Supreme Court has repeatedly recognized are sensitive places within which restrictions on the carrying of firearms are presumptively lawful. See *Bruen*, 597 U.S. at 30; *McDonald*, 561 U.S. at 786; *Heller*, 554 U.S. at 626; see also *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring). We find that, notwithstanding the changes in second-amendment jurisprudence, this restriction that we found was valid in *Bell*, remains valid today.

¶ 43    We rely specifically on the rationale the court adopted in *Wolford*. Regulations of guns in public parks have been in place, without question or challenge, since modern public parks came into being. *Wolford*, 116 F.4th at 982. In addition, public parks are analogous to schools, which the United States Supreme Court has recognized as the kind of sensitive place where gun regulation is constitutional. *Id.* at 983. For the reasons that follow, we reject each of Mr. Temple's efforts to persuade us otherwise.

¶ 44    Mr. Temple first contends that public green spaces that existed in 1791 were akin to modern parks; thus, Illinois must show, under the stricter requirements of *Bruen*'s "fairly straightforward"

13

standard, that the UUW regulation of guns in public parks had a clear historical counterpart at the founding of the country. We disagree.

¶ 45    Although founding-era green spaces, like Boston Common, were used for occasional recreation and public gatherings, these examples do not demonstrate that such spaces were analogous to modern public parks. The *Wolford* and *Antonyuk* courts rejected that very argument, explaining that the *primary* uses of Boston Common at the founding—such as grazing animals and holding military exercises—were not akin to the purposes modern parks serve today. See *id.* at 982; *Antonyuk*, 120 F.4th at 1024. Isolated references to leisure or congregation on these green spaces do not transform them into public parks as we understand them today. We agree with those courts that such examples of founding-era green spaces are not relevantly similar to modern parks and, thus, the State is not required to show that guns were regulated in those places to the extent the State now seeks to regulate them in public parks.

¶ 46    As the *Wolford* court recognized, green spaces did not begin taking the shape of modern parks until the middle of the nineteenth century, thus, the "more nuanced" approach applies. (Internal quotation marks omitted.) *Wolford*, 116 F.4th at 977, 982. In applying *Bruen*'s "more nuanced" approach to a sensitive places analysis, the proper question is whether, when public parks took their modern form, governments began to regulate firearms in ways that were considered constitutional and were consistent with the tradition of regulating analogous places. See *id.* at 982-83. The historical record shows that they did. Central Park, which opened in 1858 and is widely considered the first modern public park in the United States, was subject to a firearm ban from its inception. *Id.* at 982. Governments enacted similar regulations as parks emerged across the nation, including at Prospect Park (New York City, 1866), Fairmount Park (Pennsylvania, 1868), Golden Gate and Buena Vista Parks (San Francisco, 1872), and Liberty Park (Salt Lake City, 1888). Many

14

municipalities, including major cities, prohibited the carrying of firearms in all parks: Chicago (1872); South Park, Illinois (1875); Phoenixville, Pennsylvania (1878); Saint Louis, Missouri (1881); Danville, Illinois (1883); Boston, Massachusetts (1886); Reading, Pennsylvania (1887); St. Paul, Minnesota (1888); Trenton, New Jersey (1890); Grand Rapids, Michigan (1891); Springfield, Massachusetts (1891); Lynn, Massachusetts (1892); Spokane, Washington (1892); Pittsburg, Pennsylvania (1893); Wilmington, Delaware (1893); Canton, Illinois (1895); Detroit, Michigan (1895); Indianapolis, Indiana (1896); Kansas City, Missouri (1898); New Haven, Connecticut (1898); and Boulder, Colorado (1899). *Id.* at 982-83 (citing *Maryland Shall Issue*, 680 F. Supp. 3d at 585-86 (summarizing similar evidence concerning parks), and *Kipke*, 695 F. Supp. 3d at 654-55 (same)).

¶ 47    Importantly, Mr. Temple provides no evidence—nor have we found any—that these laws were questioned as unconstitutional. Their widespread and uncontested adoption supports the conclusion that such regulations fit within the nation's historical tradition. We therefore agree with the Ninth Circuit, the Second Circuit, and the several district courts that have held that regulations on firearms in public parks are consistent with the nation's historical tradition. See *Wolford*, 116 F.4th at 983; *Antonyuk*, 89 F.4th at 355-63; *Kipke*, 695 F. Supp. 3d at 654-55; *Maryland Shall Issue*, 680 F. Supp. 3d at 585-88. *Contra Koons*, 673 F. Supp. 3d at 639-42; *Springer*, 704 F. Supp. 3d at 1214-18. Mr. Temple has cited no cases holding to the contrary.

¶ 48    We are also unconvinced by Mr. Temple's argument that the State must identify a single characteristic that unifies public parks with each of the locations the Supreme Court has specifically listed as "sensitive places"—such as legislative assemblies, polling places, courthouses, and schools—in order to justify including public parks in that category. Mr. Temple suggests that the relevant commonality is that all previously identified sensitive places are

buildings. Since public parks are not buildings, they cannot be sensitive places. But the Supreme Court has never held that a common thread is a necessary component of the sensitive place analysis nor has it ever suggested that only indoor spaces can be "sensitive."

¶ 49    Mr. Temple further contends that the State failed to show why the need for self-defense is diminished in public parks or why parkgoers should be excluded from the second amendment's protections. *Bruen* does not require such policy justifications. Indeed, the *Bruen* Court made clear when it rejected the means-ends test that applying policy considerations justifying the regulation was "one step too many." *Bruen*, 597 U.S. at 19. As Mr. Temple himself acknowledges in his brief, in *Bruen* "[t]he Supreme Court rejected *any* means-end scrutiny and adopted an exclusively historical approach to the analysis of Second Amendment challenges."

¶ 50    In his reply brief and at oral argument, Mr. Temple asserted that the State failed to demonstrate a historical tradition of imposing penalties comparable to the felony consequences imposed by the UUW statute. We are unconvinced by this argument. While the severity of a regulation's penalty is *relevant* to the historical inquiry, differences between historic and modern penalties are not dispositive. *National Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1129 (11th Cir. 2025), *pet. for cert. filed* (May 20, 2025), (citing *Rahimi*, 602 U.S. at 699). In *Bondi*, the Eleventh Circuit upheld a Florida statute restricting firearm purchases by individuals under 21, despite noting that founding-era laws did not impose criminal penalties for similar conduct. *Id.* at 1129-30. The court explained that "the lack of criminal penalties at the Founding is not dispositive," especially because many criminal penalties emerged later on, in the nineteenth century. *Id.* at 1129. Though the modern law imposed more severe consequences than its historical analogues, the *Bondi* court concluded that the burden was not so dissimilar as to undermine the regulation's historical consistency. *Id.* at 1129-30.

16

¶ 51    The same is true here. The fact that a violation of this provision of the UUW statute is a Class 3 felony punishable by imprisonment of two to five years (720 ILCS 5/24-1(a)(10), (c)(1.5) (West 2010); 730 ILCS 5/5-4.5-40 (West 2010)), while historical analogues may have imposed lesser penalties, does not, on its own, render the statute unconstitutional. Although early regulations may have relied on fines or misdemeanor charges, those penalties served the same function: deterring the public from carrying firearms in public parks. See *Bondi*, 133 F.4th at 1130 (reasoning that "[a]lthough there was no risk of imprisonment until the nineteenth century, other incentives nevertheless discouraged the sale of firearms to individuals under the age of 21" and concluding that "[t]he burden on the right is not so different as to compel the conclusion that this 'relevant aspect' deserves dispositive weight"). Here, as in *Bondi*, this distinction regarding the severity of the penalties does not defeat the analogy between the challenged and historical laws.

¶ 52    Finally, Mr. Temple asserted at oral argument that any reliance by this court on the fact that public parks are "sensitive places" is inconsistent with this court's decision in *Bell*. In that case, this court found it necessary to reach and uphold the regulation of guns in parks on the basis of means-ends scrutiny because, while it found the argument that public parks were "sensitive places" to be "compelling," the State had not provided "conclusive evidence or authority" that a park was a sensitive place. *Bell*, 2018 IL App (1st) 153373, ¶¶ 23-24.

¶ 53    As noted throughout this opinion, the legal landscape has changed dramatically since we issued our opinion in *Bell*. As this court discussed extensively with the lawyers at oral argument in this case, the route for the State to supply evidence on historical facts still remains somewhat uncharted. However, the courts in *Wolford* and *Antonyuk* (both cases decided after *Bell*) cited extensive historical information that we rely on today in holding that public parks can be categorized as sensitive places. Nothing in *Bell* is inconsistent with this conclusion.

17

¶ 54                                    IV. CONCLUSION

¶ 55    For these reasons, we reject Mr. Temple's facial challenge to the UUW statute's prohibition

of firearms in public parks and affirm the circuit court's denial of his section 2-1401 petition.

¶ 56    Affirmed.

---

### *People v. Temple*, 2025 IL App (1st) 240917

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-14529; the Hon. Thomas J. Hennelly, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Erica Margaret Mail, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Sara McGann, and Gerrard R. Burch Jr., Assistant State's Attorneys, of counsel), for the People. |

---